**KEETON CORRECTIONS, INC., Plaintiff;**

v.

**The UNITED STATES, Defendant,**

and

**Dismas Charities, Inc., Intervening Defendant.**

**No. 04–132C.**

United States Court of Federal Claims.

March 17, 2004.

John G. DeGooyer, Washington, D.C., attorney of record for plaintiff, with whom

were Philip A. Nacke and David T. Ralston, Jr., Washington, D.C., of Counsel.

David S. Silverbrand, Washington, D.C., Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Robert E. Kirschman, Jr., Assistant Director for defendant. Tracey L. Printer, Assistant General Counsel, Federal Bureau of Prisons, of Counsel.

Daniel S. Herzfeld, Washington, D.C., Dismas Charities, Inc., defendant-intervenor.

## OPINION

MEROW, Senior Judge.

In this post-award protest, Keeton Corrections, Inc. ("Keeton") challenges the decision by the Federal Bureau of Prisons ("BOP") to override the automatic stay which occurred when Keeton challenged the award of a community correction center contract in Memphis, Tennessee. The court has denied plaintiff's motions for a temporary restraining order ("TRO") and preliminary injunction premised largely on plaintiff's lack of any right to a contract to perform the service required during the protest period. In the February 13, 2004 Order denying injunctive relief, the court also held that in order to determine the validity of the override action taken by the BOP, the "record must be supplemented to include the basis and factual predicate for the apparent decision that purchase orders could not be utilized to provide the service urgently required during the protest period." *Keeton Corrections, Inc. v. United States*, No. 04–132C, Slip. Op. at 6 (Feb. 13, 2004). Subsequently, at the court's request, the BOP submitted additional documentation addressing the agency's decision that it could not continue with purchase orders. The validity of the BOP's override decision is now before the court under the arbitrary and capricious standard of review. *See* 28 U.S.C. § 1491(b)(4). For the reasons stated below, the BOP's override of the auto-

matic stay is declared invalid and the stay remains in effect.

## FACTS

The background facts of this case were fully explained in the court's February 13, 2004 Order denying plaintiff's requests for a TRO and preliminary injunction. Briefly, the undisputed facts relevant to the resolution of this case are as follows. On March 14, 2002, the BOP issued Request for Proposals No. 200–0730–MA ("RFP") for a new contract to provide community correction center services for male and female offenders in the Memphis, Tennessee area. The BOP received offers from both Keeton and Dismas Charities, Inc. ("Dismas"). At the time, Keeton was the incumbent contractor to operate a halfway house. It was originally awarded a two-year contract with three one-year option periods. Administrative Record ("AR") 1. Keeton's contract expired on February 15, 2003 after the BOP invoked all three option periods. Under authority provided for in Federal Acquisition Regulation ("FAR") 52.217–8, the BOP extended Keeton's contract for six months until August 15, 2003.[1] AR 29. On June 9, 2003, the BOP awarded a two-year contract to Dismas with three one-year option periods. Keeton subsequently filed a protest with the General Accounting Office ("GAO") on June 26, 2003, invoking the automatic stay provided for under the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d). In response to Keeton's protest, the BOP decided to take corrective action and ordered a re-evaluation of Keeton's and Dismas' proposals. On December 18, 2003, the BOP notified GAO that it had again awarded the contract to Dismas. On December 31, 2003, Keeton filed a second protest concerning the award which invoked the CICA automatic stay. The automatic stay provision provides that the agency shall direct the contractor to cease performance during the protest period, except that the head of the procuring activity may authorize performance, notwithstanding the protest, upon a written finding that:

---

1. 48 C.F.R. § 52.217–8 "Option to Extend Services" provides: "The Government may require continued performance of any services within the limits and at the rates specified in the con-

tract.... The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months."

(I) performance of the contract is in the best interests of the United States; or (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest;

31 U.S.C. § 3553(d)(3)(C).

From August 16, 2003 through January 31, 2004, Keeton continued to provide its services to the BOP by entering into a series of sole source monthly purchase orders. AR 31–38. The purchase orders provided that Keeton would provide community correction center services under the terms provided for in the expired contract and extended services clause. On January 21, 2004, Harley G. Lappin, Director of the BOP, authorized performance by Dismas, notwithstanding Keeton's second protest pending before the GAO based on asserted urgent and compelling circumstances. AR 41–43. The merits of Keeton's bid protest remain with the GAO. A decision by the GAO is expected by April 9, 2004. On February 1, 2004, the inmates were transferred from Keeton's facility to Dismas. On February 13, 2004, plaintiff's motions for a TRO and preliminary injunction were denied.

## DISCUSSION

### I. Jurisdiction and Standard of Review

The Court of Federal Claims has jurisdiction to review an agency's decision to override a CICA automatic stay pursuant to 28 U.S.C. § 1491(b)(1). *See RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286 (Fed.Cir.1999). To afford relief in a bid protest matter, the court "may award any relief that the court considers proper, including declaratory and injunctive relief ...." 28 U.S.C. § 1491(b)(2). The court must review the agency's decision to override the automatic stay to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4); *RAMCOR,* 185 F.3d at 1290; *PGBA, LLC v. United States,* 57 Fed. Cl. 655, 657 (2003). Thus, the court should not overturn the agency's decision unless plaintiff demonstrates "(1) the procurement

official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001); *SDS Int'l, Inc. v. United States,* 55 Fed.Cl. 363, 365 (2003).

An agency's decision can be found to be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In evaluating the director's findings, the court "is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Instead, it must look to see whether the agency considered the relevant factors and made a rational determination. *See Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000).

### II. Analysis

In issuing his determination and findings, the BOP director held that:

> Urgent and compelling circumstances exist that significantly affect the interests of the United States and will not permit waiting for the GAO's decision. Specifically, these include: substantial costs to relocate inmates currently residing in Keeton's Memphis facility to alternate locations that are under contract while awaiting GAO decision; potential return of inmates to institutions from which they were released; possible delayed release of presently incarcerated inmates into appropriate community placements; and, substantial disruption to inmates' ability to transition back into the Memphis community.

AR 42.

According to the director's findings, the urgent and compelling circumstances were based on the fact that Keeton's contract had expired on August 15, 2003, and therefore

action must be taken to accommodate the BOP's continuing need for correction services. However, the director's findings contained no reference to purchase orders and failed to provide a factual basis for the proposition that the BOP could no longer rely on purchase orders during the protest period. Plaintiff argues that the agency's decision to override based on urgent and compelling circumstances lacks a rational basis because it did not consider that Keeton could continue to perform during the protest period under purchase orders. Plaintiff asserts that the purpose of the CICA stay is to preserve the status quo until the GAO issues a decision. Therefore, Keeton maintains that the agency was required to abide by the stay and continue to issue purchase orders during the protest period. Indeed, the only reason that there was an available contract in place on February 1, 2003 was that the agency decided to override the automatic stay.

At oral argument and in its initial briefing, the government asserted that the BOP must have believed that FAR § 13.003, which allows for simplified acquisition procedures such as purchase orders, does not apply if an agency can meet its requirements using "existing indefinite delivery/indefinite quantity contracts; or [ ] other established contracts." 48 C.F.R. § 13.003(a). However, there was nothing in the original administrative record that would have supported the court's reliance on this explanation. Indeed, "argument by counsel, unsupported by affidavits, is unavailing." *J & H Reinforcing & Structural Erectors, Inc. v. United States*, 50 Fed.Cl. 570, 577 (2001) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed.Cir.1984)). Defendant's argument that it could not proceed with sole source purchase orders after the expiration of Keeton's contract and six month extension is contradicted by the fact that the BOP began issuing purchase orders after Keeton's first protest invoking the automatic stay on August 15, 2003. Defendant failed to explain why utilizing purchase orders was valid after Keeton's first protest but became invalid upon its second protest. According to defendant's argument, furthering competition required the

agency to override the automatic stay even though the stay was put into place to preserve competition. However, this circular logic would require the government to override the automatic stay in every situation where an urgent continuing service need existed but an incumbent's contract had expired. This could potentially allow the government to delay awarding a new contract in such a situation until after the incumbent's contract expired and thus evade the application of an automatic stay. It does not seem logical that an agency could rely on the existence of a stayed contract to preclude continued sole source purchase orders which, in turn, would then create the urgent and compelling circumstances that would allow an override of the stay. Because of the absence of any reference to the underlying decision not to continue with purchase orders during the protest, the director's override decision could not be reviewed, under the applicable standard, based on the earlier administrative record.

In its supplementation of the record, the BOP's principal assertion is that it considered the continued use of purchase orders as a violation of the simplified acquisition procedures contained in the FAR. Specifically, the agency argues that purchase orders during the protest period would be considered illegal fragmenting of its requirements in order to stay within the required monetary limits. The BOP also contends that purchase orders were no longer acceptable once Dismas was able to begin performance because it would violate the requirements of full and open competition. It submits that the availability of an established contract with Dismas prevented it from entering into continued purchase orders with Keeton. Finally, the contracting officer relied upon cost savings resulting from performance under the new contract. The BOP decided that it was preferable to commence performance on an awarded, but protested, contract rather than continue with sole source purchase orders with Keeton. According to the draft determination and findings, the BOP contracting officer noted that "[s]ervices are currently being performed by Keeton on a month to month Purchase Order under a

stay of performance due to the first protest. The BOP needs to get out of the month to month purchase order acquisition of services and proceed with the awarded contract." Notice of Filing of Supplement to Administrative Record ("Def.'s Supplement") at 8. The draft also included, as a basis for the existence of urgent and compelling circumstances, "the increasing cost of services currently performed without competition; ...." Def.'s Supplement at 8. According to the BOP contracting officer:

> The monthly purchase orders were each under the simplified acquisition threshold (SAT) per FAR 13.003, however the cumulative value exceeded the SAT. We realized we should not be using simplified acquisitions in this case because the service required was not limited to one month periods-it was more than that. FAR 13.003(c)(2) prohibits breaking down requirements aggregating more than the SAT into several purchases that are less than the applicable threshold merely to use the procedures.

Affidavit of Rebecca Canfield, Contracting Officer, BOP, Feb. 23, 2004, ¶ 6, Def.'s Supplement at 2.[2]

However, neither the draft determination and findings nor the affidavit provide any support for the conclusion that performance of the required services by Keeton via purchase orders resulted in increasing costs. Instead, the purchase orders indicated that Keeton agreed to continue performance under the terms of its original contract. *See* AR 31–38. Thus, the cost to the government under the purchase orders was the same as the amount specified for each option period under the original contract. *See* AR 2. Unlike *Sierra Military Health Servs. v. United States*, 58 Fed.Cl. 573, 579 (2003), the BOP director has made no specific findings that the new contract will provide improved services to the government at a lower cost. In *Sierra*, the director made factual findings based upon a cost comparison calculation involving the savings anticipated under the

new contract and the cost of extending the existing contracts. *Id.* at 580–81. The BOP's assertion that a failure to override the stay would result in increased costs to the government is wholly unsupported by the record. *See PGBA*, 57 Fed.Cl. at 661–62. In fact, here the record indicates that the cost to the government is higher under the Dismas contract than under the Keeton purchase orders.

The BOP's assertion that sole source purchase orders during the automatic stay period pending a GAO protest decision do not comply with the competition provision of CICA is unsupported by law. The agency must balance the needs for full and open competition with the purpose of the automatic stay to preserve the status quo. *Id.* at 657–58. Thus, agencies may not resort to small, recurring purchase orders merely as a loophole to evade Congress' intent to further competition. On the other hand, Congress also provided that simplified procedures should be available in certain situations. The District Court for the District of Columbia found that "good faith efforts to comply with CICA's mandate for competitive procurement will protect a procurement officer's decision-making from a potential legal challenge of fragmenting." *Petchem, Inc. v. United States*, 99 F.Supp.2d 50, 56 (D.D.C. 2000). In that case, the protestor alleged that the Navy was violating CICA by improperly fragmenting the contract at issue. However, the court held that there must be a clear intent to violate CICA. *Id.* There is no clear intent to violate the competition requirements where the BOP resorted to temporary, short-term purchase orders to secure necessary services during the required stay period. During the stay period, until February 1, 2004, there was no other existing facility that could perform the necessary services. Therefore, the BOP was properly relying on the ability to enter into such contracts. This is even more clear where BOP is unsure as to the length or cost of the

---

**2.** 48 C.F.R. § 13.003(c)(2) provides: Do not break down requirements aggregating more than the simplified acquisition threshold ... or the micro-purchase threshold into several purchases that are less than the applicable threshold merely

to—(i) Permit use of simplified acquisition procedures; or (ii) Avoid any requirement that applies to purchases exceeding the micro-purchase threshold.

interim period due to the uncertainty of the exact GAO decision date.[3]

In this case, the BOP did not resort to purchase orders merely to avoid awarding a community correction center contract pursuant to full and open competition. Instead, it relied on purchase orders precisely because it wanted to reevaluate the bids and award the contract to the offeror presenting the best value. After Keeton's contract expired, there was no other facility in the Memphis area that could fulfill the BOP's need for these services. Therefore, it was proper to rely upon sole source purchase orders because they preserved competition until the GAO could decide the merits of Keeton's protest. The BOP is not in a situation where it will continue to use short-term orders indefinitely to avoid awarding the contract pursuant to an open solicitation. In fact, the GAO's pending decision will ensure that the contract is performed after a competitive solicitation. Without the exact knowledge of how long it would need interim services until the contract could be competitively awarded pursuant to a GAO decision, the BOP could not have a clear intent to evade CICA.

An additional reason cited by the BOP for overriding the stay is that it could no longer rely upon purchase orders once there was an established contract in place.[4] See 13 C.F.R. § 13.003(a)(3). However, this ignores that the Dismas contract was not a legally established contract because of the existence of an automatic stay. The BOP's position would preclude it from ever using short-term sole source awards to comply with a stay imposed pursuant to bid protest. The existence of another contractor ready to begin performance simply cannot create the urgent and compelling circumstances needed to override the stay. In any situation where a follow-on

contract is awarded, there will likely be another contractor in addition to the protestor that is able to perform.

Furthermore, the GAO has held that an agency's use of sole source purchase orders during the pendency of a stay period is proper under CICA.[5] It held that sole source purchase orders are valid "where the agency is using small purchase procedures to make short-term, filler buys until a fully competitive award can be completed ...." Mas-Hamilton Group, Inc., 1992 WL 328756, 72 Comp. Gen. 6, 11, B–274990, 92–1 CPD P 259 (Comp.Gen. Oct. 20, 1992). The GAO has also noted that "when an agency is faced with a critical need while being simultaneously unable to proceed with a fully competitive award for that item, it may properly use the small purchase procedures as an interim means to procure its needs until a fully competitive award is possible." Master Sec., Inc., 1997 WL 11254, *6, B–274990, 97–1 CPD P 21 (Comp.Gen. Jan. 14, 1997). During the stay period, "agencies are faced with uncertainty regarding the amount of time necessary to reach an ultimate resolution of the matter; .... During this time, agencies must have some method by which they can reliably meet ongoing requirements and at the same time preserve the opportunity for meaningful relief." Unified Indus., Inc., 1990 WL 293799, B–241010, 70 Comp. Gen. 142, 145, 91–1 CPD P 11 (Comp.Gen. Dec. 19, 1990).

In Unified Indus., bids were solicited for a follow-on contract for data processing services to commence on October 1, 1989. The original contract with RGI was due to expire on September 30, 1989. The GAO sustained Unified's first bid protest and recommended solicitation of best and final offers. Unified subsequently filed a second protest which

**3.** 31 U.S.C. § 3554(a)(1) (2004) provides: "Except as provided for under paragraph (2) of this subsection, the Comptroller General shall issue a final decision concerning a protest within 100 days after the date the protest is submitted to the Comptroller General."

**4.** The Dismas contract is a Firm–Fixed Unit Price, Requirements type contract and does not qualify as an existing indefinite delivery/indefinite quantity contract under FAR § 13.003(a)(2). See Pl.'s Supplemental Br., Attach. B.

**5.** While GAO decisions in procurement cases are not binding on the court, the court may accord deference in recognition of their special expertise. Bean Dredging Corp. v. United States, 22 Cl.Ct. 519, 522 (1991) (citing Honeywell, Inc. v. United States, 870 F.2d 644, 647–648 (Fed.Cir. 1989)); Howell Constr., Inc. v. United States, 12 Cl.Ct. 450, 452 (1987).

resulted in the Navy taking corrective action and dismissal of the protest. However, the Navy resorted to modifications extending RGI's performance due to the fact that the contract had expired during the protest and reevaluation period. Ultimately, Unified filed a third protest challenging the Navy's use of sole source extensions during this period. The GAO found that the Navy had acted reasonably in relying upon sole source awards because it was consistent with the overall purpose of the CICA stay by preserving the status quo until a final decision. *Unified Indus.*, 70 Comp. Gen. at 145. BOP's assertions regarding the use of purchase orders are unsupported by the administrative record and contrary to law. Therefore, the BOP's determination and findings cannot withstand scrutiny under the rational basis standard of review. The January 21, 2004 override decision lacks the required rational basis and cannot be sustained.

Absent a valid override decision the stay mandated by 31 U.S.C. § 3553(d) remains in effect. However, the fact that the stay has remained in effect does not, itself, create an urgent and compelling circumstance which would now support an immediate, fresh override decision by the BOP. As purchase orders can be used to meet the continuing BOP needs, an award of such an order to Dismas or Keeton to meet BOP needs during the protest period could be used even if its performance of the contract under protest remained stayed. Keeton has no existing contractual right to perform the service and is not entitled to an automatic extension of purchase orders. If purchase orders are continued to be used during the stay period once a second facility in Memphis was available, the BOP would be under an obligation to seek competition for each purchase order. *See* 13 C.F.R. § 13.104. The BOP may also limit the number of sources from which it solicits bids if the agency's need for these services has an unusual and compelling urgency. *See* 13 C.F.R. § 6.302–2. However, the agency is not limited to entering into purchase orders only with Keeton during the stay period. *See Bannum v. United States,* 56 Fed.Cl. 453, 456 (2003) ("That limitation is for the benefit of the procuring agency and offers no support for directing an extension

of plaintiff's contract by purchase order at the behest of the contractor."). While the agency has not shown any valid urgent and compelling circumstances which would support overriding the automatic CICA stay, the rationale for limiting its consideration for purchase orders to either Keeton or Dismas during the stay period is based on the fact that these are the only two available facilities. The agency is faced with the unusual circumstance where an incumbent's contract has expired yet the agency cannot proceed with the new contract because of the stay.

While performance under the contract awarded to Dismas cannot occur because it is stayed, the service presently being performed by Dismas could be compensated if it is considered to be occurring pursuant to an implied-in-fact purchase order. · *New York Mail & Newspaper Transp. Co. v. United States,* 139 Ct.Cl. 751, 154 F.Supp. 271 (1957); *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 373 (1963). Viewed in this light, the present service would have a $100,000 limit and given the existence of at least two facilities in Memphis, any additional purchase order required during the stay period would require competition to the maximum extent practicable. *See* 48 C.F.R. § 13.104; 13 C.F.R. § 6.302–2(c)(2) ("[A]gencies shall request offers from as many potential sources as is practicable under the circumstances."). In any event, as purchase orders for the needed service can be awarded and there are available facilities in Memphis to perform the needed services during the protest period, no valid basis for the override of the automatic stay has been shown to exist.

### CONCLUSION

Accordingly, as the January 21, 2004 override decision lacks a rational basis it is **ORDERED** that Final Judgment shall be entered DECLARING the override to be invalid and to be of no effect, with the result that the stay mandated by 31 U.S.C. § 3553(d)(3) remains extant.